506 So.2d 535 (1987)
JULIUS COHEN JEWELER, INC.
v.
SUCCESSION OF John E. JUMONVILLE, Sr., Barbara Nations Jumonville and John E. Jumonville, Jr.
No. 85 CA 1524.
Court of Appeal of Louisiana, First Circuit.
March 4, 1987.
Rehearing Denied May 6, 1987.
*536 Ellis B. Muroy, McGlinchey, Stafford, Mintz, Cellini & Lang, New Orleans, for plaintiff-appellant.
David M. Ellison, Jr., Ellison & Smith, Baton Rouge, for defendants-appellees.
Before EDWARDS, WATKINS and LeBLANC, JJ.
WATKINS, Judge.
Plaintiff, a jeweler, brought this lawsuit to recover the balance due on a sale of jewelry to former Louisiana State Senator John E. Jumonville, Sr. The Senator's Succession defended on the ground that the senator was mentally incapable of contracting to buy the jewelry. The jeweler appeals from the trial court's judgment in favor of the Succession. We reverse.

*537 FACTS
Although the central incident in this suit, the sale of over $190,000 worth of jewelry, took place in February of 1983, we will first describe the relevant incidents leading up to the sale.

The Prior Dealings
Julius Cohen, a New York jeweler, first met Senator John E. Jumonville, Sr. in March of 1981 while they were patients at the Pritikin Institute in California. On the day they met, the Senator bought a fifteen-carat diamond from Cohen for more than $30,000. Cohen's testimony indicates that the Senator was a free and generous spender. For example, one afternoon in Beverly Hills, California, Cohen was present when the Senator purchased an automobile for the Senator's mother for $75,000. The Senator made a number of other jewelry purchases from Cohen, totaling in excess of $200,000, through February of 1982. Many of the items were purchased as gifts for the Senator's family members.

The Interdiction Suit
In May of 1982, the Senator's mother, brothers and sister filed a petition to have the Senator interdicted, and sought to have provisional curators appointed during the pendency of the suit. Their petition alleged that the Senator was "mentally and physically infirm" and "completely incapable of taking care of his person and of administering his estate." Annexed to the petition was the affidavit of a physician, who gave his opinion that the Senator was "both mentally and physically incapable of caring for his person and his property, and that this condition is irreversible."
On May 10, 1982, the trial court, without a contradictory hearing, ordered that the Senator's two brothers be appointed as his provisional curators. The trial court subsequently denied two motions by the Senator to set aside the appointment of the provisional curators. Senator Jumonville died on May 4, 1983, and no judgment of interdiction was ever rendered against him.

The Jewelry Sale
On February 19, 1983, Julius Cohen and an assistant flew to New Orleans, at Senator Jumonville's request, to show the Senator various pieces of jewelry. During the evening, more than 300 pieces of jewelry were examined by the Senator; the Senator's sister, Sese Halstead; his girlfriend, Rosemary Norris; and his alleged illegitimate daughter, Debra Pylant. The Senator finally agreed to purchase a number of items valued at $194,840, most of which were selected as gifts for Rosemary Norris, for Rosemary's daughter, and for Debra Pylant's daughter.
The next day, after learning that the Senator's mother and sister were unhappy that the Senator had bought so much jewelry for people "out of the family," Mr. Cohen unsuccessfully attempted to dissuade the Senator from the sale. It was not until the following day, February 21, 1983, that Mr. Cohen first learned, after speaking with the Senator's son, of the pending interdiction suit. Cohen then attempted, again unsuccessfully, to convince the Senator to cancel the jewelry sale. Cohen was able, however, to regain most of the jewelry from Rosemary Norris, who he met by chance while preparing to return to New York. Ms. Norris gave Mr. Cohen all but two items of jewelry selected for her, and told him that she would try to retrieve two other items given to her daughter.
Cohen then returned to New York, and ultimately submitted a bill to the Senator for the unreturned jewelry, that is, for a diamond bracelet ($5,400) and diamond ring ($16,800) given to Rosemary; a garnet bracelet ($6,800) and emerald neck chain ($8,400) given to Rosemary's daughter; and a diamond ring ($2,800) and sapphire bracelet ($1,440) given to Debra Pylant's daughter, Melissa. Cohen made no further effort to get any of the jewelry from the recipients. As stated above, Senator Jumonville died on May 4, 1983.

The Present Suit
The jeweler filed the present suit in December 1983 against the Succession of John E. Jumonville, Sr. and its representatives *538 ("the Succession") for the value of the unreturned jewelry bought by the senator, $41,640. Plaintiff contended that the Senator had entered into a binding contract and that the Succession was responsible for payment of the balance due. Plaintiff also sought attorney's fees under LSA-R.S. 9:2781, and contended that the defendants were equitably estopped from asserting the defense of incapacity to contract. Defendants argued that the contract was null because the filing of the petition for interdiction and appointment of the provisional curators voided any attempt by the Senator to contract after that date. Defendants also contended that Cohen's retrieval of most of the jewelry from Rosemary Norris "vitiated" the contract, but that, in any event, Cohen's failure to retrieve all of it was a failure on his part to mitigate his damages.
After a trial in September 1985, the trial court rendered judgment in favor of defendants, and the jeweler appealed.

STATEMENT OF LAW
Plaintiff filed suit to enforce a contract for the sale of jewelry. A contract is an agreement, in which one person obligates himself to another, to give, to do or permit, or not to do something, expressed or implied by the agreement. LSA-C.C. art. 1761 (Amended by Acts 1984, No. 331, § 1). See LSA-C.C. art. 1906 (Acts 1984, effective Jan. 1, 1985).[1]
There are four elements required for the confection of a valid contract: (1) the parties must have the capacity to contract; (2) the parties' mutual consent must be freely given; (3) there must be a certain object for the contract; and (4) the contract must have a lawful purpose. LSA-C.C. art. 1779; First Nat'l Bank of Shreveport v. Williams, 346 So.2d 257, 260 (La.App. 3d Cir.1977). See LSA-C.C. arts. 1918, 1927, 1966, 1971 (effective January 1, 1985).
The testimony presented at trial established that the agreement between the jeweler and the Senator was the product of their mutual consent, that it had a certain object and a lawful purpose. The issue, then, is whether the Senator had the capacity to make a binding contract on February 19, 1983.

Capacity to Contract
The general rule is that all persons are presumed capable of contracting, except those who have been declared incapable by law. See Standard Life & Accident Ins. Co. v. Pylant, 424 So.2d 377, 379 (La. App. 2d Cir.1982), writ denied, 427 So.2d 1212 (La.1983); LSA-C.C. arts. 25, 1782, 2445. See also LSA-C.C. art. 1918 (Acts 1984).
Attacks on contracts for lack of mental capacity are governed by Civil Code articles 400-403 and 1788-1789. As a general proposition, the acts of a deceased person may not be attacked unless a petition for his interdiction was filed, or a judgment of interdiction was rendered, before his death. LSA-C.C. arts. 403, 1788(4). See LSA-C.C. art. 1926 (Acts 1984). The exceptions, which are not applicable here, are (1) when the contract is gratuitous, (2) when the contract itself contains evidence of insanity, and (3) when the contract was made within thirty days of the alleged incompetent's death. LSA-C.C. arts. 403, 1788(5)-(8). See LSA-C.C. art. 1926 (Acts 1984).[2] Because a petition for *539 the Senator's interdiction was filed before his death, his Succession may seek to invalidate the contract.
Under the Civil Code, where a judgment of interdiction is ultimately rendered, the judgment of interdiction is conclusive evidence of an incapacity to contract, retroactive to the date the petition for interdiction was filed. LSA-C.C. arts. 400, 401, 1788(1), 1788(13). See LSA-C.C. art. 1918 (Acts 1984).[3] It is undisputed that no judgment of interdiction was ever rendered against Senator Jumonville. The Succession contends, and the trial court found, that the appointment of provisional curators for Senator Jumonville, on May 10, 1982, prevented the Senator from contracting after that date and raised the conclusive presumption of incapacity.
Under LSA-C.C. article 1788(1), the conclusive presumption of incapacity to contract arises only after a judgment of interdiction. A judgment of interdiction restricts the person interdicted from exercising his civil rights, such as the right to sue and be sued in his own name, LSA-C.C.P. arts. 684, 733; the right to manage his own estate, LSA-C.C. art. 31; and, of course, the right to enter into contracts, LSA-C.C. arts. 31, 1788(1). Because interdiction is such a harsh remedy, it may be declared only after a contradictory trial, at which the defendant is given the opportunity to cross examine the adverse witnesses. Stafford v. Stafford, 1 Mart. (n.s.) 551, 552-53 (1823); LSA-C.C. art. 393; LSA-C. C.P. art. 4547. In the interdiction proceeding, the plaintiff has the burden of proving the defendant's incapacity to care for himself and his property, In re Ohanna, 230 La. 384, 88 So.2d 665, 666 (1956), Interdiction of White, 463 So.2d 53, 55 (La.App. 3d Cir.1985), and the proof must be clear and conclusive, Interdiction of White, 463 So.2d at 55, In re Adams, 209 So.2d 363, 364 (La.App. 4th Cir.1968). Such a contradictory trial was never held to determine the question of the Senator's incapacity. The ex parte appointment of provisional curators, pursuant to LSA-C.C. art. 394 *540 and LSA-C.C.P. art. 4549, is insufficient to raise the legal presumption of incapacity afforded a judgment of interdiction after a full contradictory trial. See, e.g., LSA-C.C. art. 1919 (Acts 1984), comment (d). ("Under this Article, a contract made by an interdict after the date of successful application for interdiction is relatively null.") (Emphasis added.)
We believe the Succession's burden of proof in this case is analogous to the burden of one attacking an onerous contract made by a noninterdicted person before the filing of any petition for interdiction. In such a case, the party attacking the contract has the burden of proving (1) that the alleged incompetent was deprived of reason at the time of contracting, and (2) that the other party knew or should have known of his incapacity. LSA-C.C. arts. 402, 1788(2)-(3), 1789. See LSA-C.C. art. 1925 (Acts 1984).[4]
The Succession failed to meet its burden of proving these elements. There was no admissible evidence presented that Senator Jumonville was deprived of reason on February 19, 1983. The only evidence of incapacity introduced, a physician's affidavit dated May 7, 1982 and attached to the petition for the Senator's interdiction, is inadmissible hearsay and is not entitled to any weight. See In re Aaron, 417 So.2d 105, 107 (La.App. 3d Cir.1982); Board of Comm'rs v. Louisiana Comm'n on Ethics, 416 So.2d 231, 238-39 (La.App. 1st Cir.), writ denied, 421 So.2d 248 (La.1982). Similarly, there was no evidence presented that Senator Jumonville was "notoriously" insane, or that Mr. Cohen knew or should have known that the Senator was incapable of contracting. To the contrary, it was undisputed at trial that Mr. Cohen was unaware of the interdiction proceedings against the Senator until he spoke with the Senator's son two days after the sale. The jeweler was summoned to New Orleans after a phone call by the Senator's sister, his hotel room was paid for by the Senator, and he was the Senator's guest, along with fourteen others, for dinner at a prominent New Orleans restaurant that evening. Considering the past dealings between them and the surrounding circumstances, Mr. Cohen had no reason to question the capacity of the Senator to enter into the contract before us.

Equitable Estoppel
Because of our finding that the Succession failed to meet its burden of proof to rescind the contract of sale, we find it unnecessary to address the jeweler's contention that defendants should be equitably estopped from asserting the defense of incapacity.

Mitigation of Damages
Defendants contend that even if the contract is valid, the jeweler failed to mitigate *541 his damages and that his award should be reduced accordingly.
The doctrine of mitigation of damages applies to Louisiana contract law. Unverzagt v. Young Builders, Inc., 252 La. 1091, 1096, 215 So.2d 823, 825 (1968).
The doctrine provides for a reduction in the amount of damages awarded to the victim of a contract breach if it is shown that all or part of the damages sustained should have been avoided. LSA-C.C. art. 2323; Alex W. Rothchild & Co. v. Lynch, 171 La. 114, 118, 129 So. 725, 727 (1930).
The standard applied in determining which damages should have been avoided is that of "a reasonably prudent person acting under the facts and circumstances in which the nondefaulting party found himself...." Unverzagt, 252 La. at 1099, 215 So.2d at 826 (emphasis omitted). If a reasonably prudent person would have prevented or limited the extent of an injury, the defendant will not be cast in judgment for the full measure of the harm. Armistead v. Shreveport & R.R. Val. Ry., 108 La. 171, 179, 32 So. 456, 459 (1901). The doctrine of mitigation of damages does not require a plaintiff to give up valuable legal rights and privileges. Langlois v. Allied Chem. Corp., 258 La. 1067, 1087, 249 So.2d 133, 141 (1971). It may, however, require him to expend reasonable sums to avoid additional losses. See Comment, 30 Loy.L.Rev. 901, 918-19 (1984).
The question is, then, what would a reasonably prudent person in Mr. Cohen's position have done upon learning of the pendency of the interdiction suit against Senator Jumonville. Mr. Cohen twice tried, unsuccessfully, to encourage the Senator to rescind the sale. He was successful, however, in retrieving more than $153,000 worth of jewelry from Rosemary Norris, out of a $194,840 sale, before returning to New York. On the facts before us we do not find that Mr. Cohen breached any duty to mitigate his damages.

Attorney's Fees
Plaintiff seeks an award of attorney's fees pursuant to LSA-R.S. 9:2781, for suits on open accounts. At the relevant time, this statute provided, in part:
A. When any person fails to pay an open account within thirty days after receipt of written demand thereof correctly setting forth the amount owed and a copy of the invoices in support thereof, that person shall be liable for reasonable attorney fees for the prosecution and collection of such claim when judgment on the claim is rendered in favor of the claimant.
(Emphasis added.)
After the sale, the plaintiff sent written demand letters with invoices, setting forth the correct amount owed, to Senator Jumonville, the Senator's son, the Senator's business, and to the Senator's wife after his death. The amounts owed were never paid. As such, we believe that plaintiff is entitled to an award of reasonable attorney's fees.
Among the factors to be considered in making an award of attorney's fees are: (1) the ultimate result obtained, (2) the responsibility incurred, (3) the importance of the litigation, (4) the amount involved, (5) the extent and character of the labor performed, (6) the legal knowledge, attainment and skill of the attorney, (7) the number of appearances made, (8) the intricacies of the facts and law involved, (9) the diligence and skill of counsel, (10) the court's own knowledge, and (11) the ability of the party liable to pay. Guillory v. Guillory, 339 So.2d 529, 531 (La.App. 4th Cir.1976).
After an examination of the record and briefs, we find that plaintiff is entitled to an award of attorney's fees in the amount of 10% of the principal amount awarded.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is reversed. Judgment is rendered in favor of plaintiff and against the Succession of John E. Jumonville, Sr. in *542 the amount of $41,640.00, with the legal interest thereon from the date of judicial demand, and for attorney's fees in the amount of $4,164.00. All costs of this proceeding are assessed against the defendant Succession.
REVERSED AND RENDERED.
NOTES
[1] The Civil Code articles dealing with obligations, as well as with incompetency, were extensively revised by Act 331 of 1984. The present case arose and will be decided under the prior law; unless otherwise noted, references are to the articles in effect before the 1984 revisions.
[2] LSA-C.C. art. 403 provides:

Art. 403. Contesting validity of acts after death
Art. 403. After the death of a person, the validity of acts done by him can not be contested for cause of insanity, unless his interdiction was pronounced or petitioned for previous to the death of such person, except in cases in which the mental alienation manifested itself within ten days previous to the decease, or in which the proof of the want of reason results from the act itself which is contested. (Emphasis added.)
Former LSA-C.C. art. 1788 provides in part:
Art. 1788. Insane persons, proof of incapacity
....
4. That, except in the case of death hereafter provided for, no suit can be brought, nor any exception made, to invalidate a contract on account of insanity, unless judgment of interdiction be pronounced before bringing the suit, or at least applied for before making the exception. (Emphasis added.)
Current LSA-C.C. art. 1926, which does not change the law, provides:
Art. 1926. Attack on noninterdicted decedent's contracts
A contract made by a noninterdicted person deprived of reason at the time of contracting may be attacked after his death, on the ground of incapacity, only when the contract is gratuitous, or it evidences lack of understanding, or was made within thirty days of his death, or when application for interdiction was filed before his death. (Emphasis added.)
[3] LSA-C.C. arts. 400-401 provide:

Art 400. Effective date of interdiction
Art. 400. The interdiction takes place from the day of presenting the petition for the same.
Art. 401. Nullity of interdict's acts during suit
Art. 401. All acts done by the persons interdicted from the date of filing the petition for interdiction, until the day when the same is pronounced, are null.
Former LSA-C.C. art. 1788 provides in part:
Art. 1788. Insane persons, proof of incapacity
Art. 1788. The contract, entered into by a person of insane mind, is void as to him for the want of that consent, which none but persons in possession of their mental faculties can give. It is not the judgment of interdiction, therefore, that creates the incapacity; it is evidence only of its existence, but it is conclusive evidence, and from these principles result the following rules:
1. That, after the interdiction, no other evidence than the interdiction itself is necessary to prove the incapacity of the person, and to invalidate any contract he may have made after the day the petition for interdiction was presented, and that no evidence to show that the act was made during a lucid interval, or to contradict the judgment of interdiction, can be admitted.
....
13. That, while the judgment of interdiction is in force, it is conclusive evidence of incapacity; but that it may be annulled, whenever the insanity ceases, but it can only be annulled by a judgment.
Current LSA-C.C. art. 1918, which does not change the law, provides:
Art. 1918. General statement of capacity
All persons have capacity to contract, except unemancipated minors, interdicts, and persons deprived of reason at the time of contracting.
[4] LSA-C.C. art. 402 provides:

Art. 402. Validity of acts before suit; notorious insanity
Art. 402. No act anterior to the petition for the interdiction shall be annulled, except where it shall be proved that the cause of such interdiction notoriously existed at the time when the acts, the validity of which is contested, were made or done, or that the party who contracted, with the interdicted person, could not have been deceived as to the situation of his mind.
Notoriously, in this article, means that the cause of interdiction was generally known by the persons who saw and conversed with the party.
Former LSA-C.C. art. 1788 provides in part:
Art. 1788. Insane persons, proof of incapacity
....
2. As to contracts, made prior to the application for the interdiction, they can only be invalidated by proving the incapacity to have existed at the time the contracts were made.
3. But in order to prevent imposition, it is not enough to make the proof mentioned in the last rule; it must also, in that case, be shown that the person interdicted was known by those who generally saw and conversed with him, to be in a state of mental derangement, or that the person who contracted with him, from that or other circumstances, was acquainted with his incapacity.
Current LSA-C.C. art. 1925, which does not change the law, provides:
Art. 1925. Noninterdicted person deprived of reason; protection of inocent contracting party by onerous title
A noninterdicted person, who was deprived of reason at the time of contracting, may obtain rescission of an onerous contract upon the ground of incapacity only upon showing that the other party knew or should have known that person's incapacity.